IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 9, 2020

**STATE OF TENNESSEE v. L. CLAY SHULER, II**

**Appeal from the Criminal Court for Davidson County**
**No. 2017-C-2126   Angelita Blackshear Dalton, Judge**

_____

**No. M2019-01231-CCA-R3-CD**

_____

Defendant, L. Clay Shuler, II, was convicted of first degree premeditated murder, tampering with evidence, and setting fire to personal property or land.  The trial court imposed a sentence of life for first degree murder, six years for tampering with evidence, to be served consecutively to the life sentence, and a concurrent two-year sentence for setting fire to personal property.  On appeal, Defendant argues that the evidence was insufficient to support his convictions.  Having reviewed the entire record and the briefs of the parties, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR. and TIMOTHY L. EASTER, JJ., joined.

Jay Umerley, Nashville, Tennessee (on appeal) and Nicholas McGregor, Nashville, Tennessee (at trial) for the appellant, L. Clay Shuler, II.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Ronald Dowdy and Addie Askew, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

*Background*

Cutrisha Thomas testified that the victim, Tremayne Cross, was her boyfriend, and they had dated approximately six months to one year before the victim died.  In 2017, Ms. Thomas lived in the Tony Sudekum Apartments, and the victim, who was from Memphis, periodically stayed at her apartment when he was in town working a

construction job. Ms. Thomas testified that she knew Defendant as "Big Boy," and he lived two apartments down from Ms. Thomas. Ms. Thomas said that while she was not friends with Defendant, he and the victim sometimes talked to each other and drank together on Defendant's balcony. Ms. Thomas testified that Defendant lived with two females but she did not know their names.

Ms. Thomas testified that on one occasion in May 2017, one of the women who lived with Defendant knocked on her apartment door. The woman said that she and the victim had oral sex on the back stairs of the apartment complex. Ms. Thomas testified that she woke the victim, and he walked outside to speak to the woman. Defendant was also present, and he and the victim exchanged words. Defendant and the victim no longer socialized together after the incident, and Ms. Thomas feared that Defendant would harm the victim. The victim then traveled back to Memphis and stayed for a period of time.

Ms. Thomas testified that the victim came back to Nashville and visited her on June 15, 2017. At some point during the day on June 15, she and the victim saw Defendant walking to his car, and Defendant and the victim talked about work. Ms. Thomas testified that she left for work that night at approximately 10:50 p.m., and the victim was alone on the porch drinking a beer. She called the victim at approximately 12:00 a.m. but he did not answer. Ms. Thomas testified that she later went on break from her job, and she drove home to check on the victim because it was unusual for him not to answer the phone. She did not find the victim anywhere but she saw Defendant and his girlfriend on their porch. Ms. Thomas testified that Defendant walked over, handed her the victim's wallet and keys, and said that the victim left in Defendant's car to go to the store for them and that they held the victim's wallet and keys to ensure that he returned Defendant's vehicle. Ms. Thomas felt it was strange that the victim left his keys and wallet, and she noted that the victim did not like to drive because he did not have a driver's license.

Ms. Thomas took the victim's wallet and keys and returned to work. She continued her attempts to contact the victim but he never answered. She later saw a news report about someone who had been stabbed. Ms. Thomas left work and drove to Vanderbilt Hospital to see if the person who was stabbed was the victim. She spoke with some detectives at the hospital and relayed her worries about the victim to them. Ms. Thomas went back to work. She left work at approximately 7:30 a.m. to return home. She knocked on Defendant's apartment door and asked him if the victim had returned Defendant's car or if he had seen the victim. Defendant said that he had not seen the victim and was going to report the car as being stolen. Ms. Thomas then asked Defendant why he would report the car stolen if he let the victim borrow it. At that time, detectives walked around the corner to Defendant's apartment. Ms. Thomas left, and that was the "last [she] heard about anything."

Officer Robert Croteau of the Metropolitan Nashville Police Department testified that he was working the East Flex Unit on June 15, 2017. At approximately 1:40 a.m., he and his partner, Kimberly Brown, responded to a call for medical service at 416 South Fourth Street in the CWA Housing area. When they arrived on the scene, Officer Croteau saw a man, later identified as the victim, lying on the ground next to the dumpster. There was a lot of blood around the victim, and it appeared that his throat had been cut from one side to the other. He was wearing a white t-shirt, boxer shorts, socks, and shoes. The victim was still alive at that point, and Officer Brown called for an ambulance. Officer Croteau testified that he put his hand over the wound on the victim's throat in an effort to stop the bleeding, and the victim attempted to communicate but Officer Croteau only heard gurgling sounds. Officers Brown and Croteau testified that there were what appeared to be drag marks and a blood trail leading from the parking lot to the dumpster where the victim was found. There was also blood up the side of the dumpster and inside the dumpster. The victim was transported to the hospital by ambulance where he later died.

Detective Paul Harris of the Metropolitan Nashville Police Department testified that he, Detective Adam Weeks, and other officers executed a search warrant at Defendant's home on June 16, 2017. Defendant and Tiffany Biggs were taken into custody and placed in separate patrol cars. Christina LeBron and several children, who also lived in the apartment with Defendant and Ms. Biggs, were permitted to remain inside the house while it was searched. Detective Harris testified that two cellular phones and a box cutter were collected during the search. He also collected a DNA swab from Defendant. Detective Harris noticed that the hair on Defendant's right forearm was "substantially shorter and missing than the hair on his left forearm."

Sergeant Daniel Henkel, a detective with the Metropolitan Nashville Police Department, testified that he was informed of the victim's murder the morning after it occurred. Based on information that he received about where the murder occurred, Sergeant Henkel began reviewing security video from the Metro Developmental Housing Agency (MDHA) at the Tony Sudekum Apartments. He reviewed surveillance video from Building 1, and saw the victim leaving the property with some other individuals in a dark colored four-door vehicle. Sergeant Henkel saw the vehicle return approximately twelve to fifteen minutes later but he did not see the victim exit the vehicle. The vehicle drove away and returned again a short time later. Sergeant Henkel observed a female exit the vehicle and go into the apartment. She came back approximately one minute later and got back into the vehicle which left the area. Detective Henkel testified that it was the last time that the vehicle was seen on the MDHA video. Detective Henkel further testified:

> There was an individual that was seen leaving with the victim that he and
> the female are the ones that got into the car with the victim. Whenever
> the car came back the first time the male and the female got out, went to

the trunk area of the vehicle, the male appeared to look inside, shut the trunk and then leave. Whenever the car came back that next time that is when the female got out. She went up to an apartment and came back a minute later, appeared to be carrying something and then probably half an hour or so after that those two same individuals seen leaving in the car the last time were observed coming back on foot. The male was observed, he had left the previous time wearing light colored pants and a black shirt. When he returned he had on the light colored pants but he did not have a shirt on.

Sergeant Henkel provided the surveillance video footage to Detective Weeks. He later interviewed Quentesa House, a resident of the CWA Apartments, and she provided him with a statement.

Quentesa House testified that on June 15, 2017, she was living in the CWA Apartments. During the early morning hours of that day, Ms. House was fighting with her children's father, and she ran from him. She ran down to the gate of her house and saw two men standing over the body of a "black, African American man." Ms. House testified that one of the men "pointed something," like a gun or a knife, at her, and she went back toward her house and signaled to her children's father to warn him that someone was standing there. She said that the body was located behind the dumpster. Ms. House testified that both men standing there were black, and one of them was "heavy set" and had dread locks. She thought that one of the men was approximately five feet ten inches tall, and the other man was taller. Ms. House agreed that she may have told Detective Weeks that the larger of the two men was wearing a black t-shirt and light colored pants. She testified that one of the men ran away on foot, and the larger man got into a four-door black car with a white woman who had "sandish, like reddish, blondish hair." Ms. House told Detective Weeks that the woman was wearing a white shirt. She asserted that the man who ran away had also searched the victim's pockets.

Rachel Mack, a forensic scientist for the Metropolitan Nashville Crime Laboratory, tested the box cutter seized from Defendant's apartment for the presence of blood. She testified that the "presumptive serological blood test was performed on this item and it did give chemical indications of blood." Ms. Mack noted that human DNA was found on the box cutter. She testified that the DNA on the interior hinge area was limited so she was unable to "interpret that data." The DNA from the exterior of the box cutter was from a mixture of three individuals but due to the "complexity of that data [she] was not able to interpret it." Ms. Mack also tested the victim's shoes, socks, and a pair of pants and found DNA from two individuals on the items. One of the DNA profiles on the shoes matched that of the victim. The other was from an unknown individual and did not match that of Defendant or Ms. Biggs. There was not enough DNA on the socks from the second individual to use for comparison. Ms. Mack testified that she excluded the victim, Defendant, and Ms. Biggs as the contributors of the DNA

found on the pants. She found the presence of DNA on a black t-shirt that also did not match that of the victim, Defendant, or Ms. Biggs. Ms. Mack testified that the DNA from the shirt matched one of the DNA profiles from the pants.

Dr. David Zimmer, a forensic pathologist and medical examiner for Davidson County, performed an autopsy on the victim. He determined that the cause of the victim's death was sharp and blunt force injuries to the victim's neck and head, and the manner of death was homicide. Dr. Zimmer testified that a sharp instrument was used to cut the right side of the victim's neck, and the right carotid artery and internal jugular vein were cut completely through. There were also blunt traumatic injuries, scratches of the victim's skin, and a contusion around his left eye. Dr. Zimmer testified that "there were other injuries of the brain and there were fractures or breaks of the bones of the skull," which were consistent with the victim's head being struck by something. He agreed that some of the abrasions to the different parts of the victim's body were consistent with his body being dragged across concrete. Dr. Zimmer testified that the cut to the victim's neck "looked like a sharp instrument was moving across the neck in a sawing motion." He noted the cut was so deep that it exposed parts of the neck bones, and the victim was still alive when the incisions to his neck were made. Dr. Zimmer agreed that the injury to the victim's neck could have been caused by a box cutter.

Tiffany Biggs testified that at the time of the victim's death, she and Defendant were dating, and they lived together at 82A Charles E. Davis Boulevard at the Tony Sudekum Apartments. Ms. Biggs testified that she previously lived at 246 South Fourth Street at the CWA Apartments. Christina LeBron, who also had a relationship with Defendant, lived in the apartment with Defendant and Ms. Biggs, and there were a total of seven children who lived there. Both Ms. Biggs and Ms. LeBron had children by Defendant. Ms. LeBron owned a black Dodge Charger that Ms. Biggs and Defendant also drove. At trial, the parties stipulated that Ms. LeBron had purchased the car. Ms. Biggs testified that she and Ms. LeBron both worked two jobs together, and they gave any money that they earned to Defendant. She said that Defendant got angry if she or Ms. LeBron talked to other men. Ms. Biggs was charged along with Defendant for the victim's murder, and her charges were pending at the time of Defendant's trial.

Ms. Biggs testified that Defendant and the victim were "drinking buddies" and drank together approximately two times a week. She said that they usually drank on the front porch of the victim's apartment or inside Defendant's apartment. The victim's girlfriend, Ms. Thomas, was usually at work while the victim and Defendant were drinking. Ms. Biggs testified that the relationship between Defendant and the victim was always friendly up until April 2017 when Ms. LeBron told Defendant that she and the victim had "sex on our bed, on our couch, and in [the victim's] apartment." She said that Defendant became "extremely angry," and he assaulted Ms. LeBron. Defendant then instructed Ms. LeBron to go to the victim's apartment and tell Ms. Thomas that the victim was cheating on her and that the victim and Ms. LeBron had sex with each other.

Ms. Biggs testified that Defendant stood on the porch and watched Ms. LeBron go to the apartment. Ms. Biggs testified that Defendant was angry with the victim and that the victim walked outside and exchanged words with Defendant. The victim told Defendant that Ms. LeBron "wasn't his type and he was not attracted to her at all and he would never do that." Ms. Biggs testified that Defendant did not believe the victim because Ms. LeBron had never lied to him. He also told the victim, "I got you," in a threatening manner.

Ms. Biggs testified that a few days to a week prior to June 15, 2017, she and Defendant were sitting in Ms. LeBron's car in the parking lot when they saw the victim and Ms. Thomas get out of their car. Defendant called the victim over to Ms. LeBron's car and asked the victim if he wanted to earn some extra money doing some janitorial work. The victim declined the offer and said that he already had a job. The conversation then ended.

Ms. Biggs testified that she and Ms. Lebron reported to work at Labor Smart on June 14, 2017, and they later reported to their second janitorial job at approximately 10:00 p.m. Ms. Biggs drove them in Ms. LeBron's Dodge Charger. Ms. Biggs testified that she and Ms. LeBron reported back to work at Labor Smart the following morning on June 15, 2017. She admitted that the victim's murder and the burning of Ms. LeBron's car occurred between the time she left work on June 14 and went back to work on June 15, 2017. Ms. Biggs testified that she initially lied to police after her arrest and told them that the victim took Ms. LeBron's car to buy drugs and that the victim voluntarily gave her his wallet and keys. Ms. Biggs eventually told police that Defendant and the victim had a "beef" because the victim and Ms. LeBron were having sexual relations. Ms. Biggs testified that she was afraid to tell police the truth because she was scared of Defendant because he was abusive, and she was afraid that he would harm her children. He had told her what to say and to lie to the police.

Ms. Biggs spoke with police a second time on September 20, 2017, and she told them the truth. She said that after arriving home from her second job on June 14, 2017, she was taking care of her daughter when Defendant asked her to find some money for him to buy drugs. Ms. Biggs located either thirteen or eighteen dollars in Ms. LeBron's car, and took it back to Defendant. She and Defendant, along with the victim, eventually got into Ms. LeBron's car to go and purchase the drugs. Ms. Biggs testified that Defendant was riding in the front passenger seat, and the victim got into the back. She noted that Defendant was much larger than the victim. Ms. Biggs testified that she drove the car up Charles E. Davis Boulevard and stopped at the corner of Charles E. Davis Boulevard and Fain Street and parked in a church parking lot. Defendant told her to keep the car running but turn off the lights. Defendant and the victim got out of the car and left but later returned. The men stayed outside of the car. Ms. Biggs heard the two men talking, and then there was a "thud on the car and it shook." She said that Defendant was acting aggressively and breathing heavily, and he yelled at her to open the trunk. Ms.

Biggs asked Defendant what was happening, and he told her to get into the passenger seat of the car. She got out and walked around the front of the car. Ms. Biggs could see Defendant doing something with the trunk but she could not see the victim. She got into the passenger's seat of the car, and Defendant got into the driver's seat. The victim did not get back into the car. Ms. Biggs testified that Defendant "drove up Claiborne, took a right on Lafayette and then went back to the church parking lot." He again got out of the car and opened the trunk. Ms. Biggs testified that Defendant was still being aggressive and breathing heavily, and he refused to tell her what was happening. She got out of the car and walked toward the back of the vehicle, but she could not see inside the trunk. Ms. Biggs testified that she was afraid and knew that something was wrong. She identified a surveillance video depicting her and Defendant's actions in the parking lot.

Ms. Biggs testified that she got back into the car with Defendant, and he drove to the CWA Apartments on South Fourth Street and parked in front of a dumpster. She said that Defendant got out of the car and told her to get into the driver's seat. Ms. Biggs saw Defendant take the victim out of the trunk, and she heard a snoring sound. She testified that Defendant dragged the victim across the pavement and to the grass beside of the dumpster. Defendant told Ms. Biggs to count the change in the car's cup holder and to empty a water bottle. Ms. Biggs testified that Defendant began looking for a lighter, and he instructed her to use the change to buy some gasoline. She then drove to the Exxon gas station on Shelby Avenue to buy the gasoline with the change from the cup holder. Ms. Biggs identified herself on the surveillance video at the Exxon station. She pumped some of the gas into the empty water bottle, and she pumped the remainder into the car.

Ms. Biggs drove back to the CWA Apartments and parked in front of the dumpster. She testified that the victim's body was still there. Defendant was wearing gray sweatpants but his shirt that he was previously wearing was missing. Ms. Biggs testified that Defendant was "smoking a cigarette and he, there was a look in his eyes and his voice didn't seem like him." She said that a car pulled in behind her, and Defendant instructed her to pull down further into the parking lot and to turn around and pick him up. Defendant got into the car, and Ms. Biggs drove back to their apartment and parked in front of the Dollar General Store at Lafayette Street and Charles E. Davis Boulevard. Defendant instructed her to go inside the apartment and find a "chemical bottle" and a rag and to "make it fast." Ms. Biggs retrieved a spray bottle with bleach and got back into the car. She drove around and eventually parked in a grassy area near a house.

Defendant instructed Ms. Biggs to sit in the car and not touch anything. He wiped the car down with the rag and bleach and then told Ms. Biggs to get out of the car and not move or look at anything or say anything. Ms. Biggs testified that she "just stood there and [she] was looking at that house and it had a yellow porch light on." She said that Defendant poured gasoline on the trunk of the car and in the back seat, and he set the car on fire. Ms. Biggs testified that Defendant was not wearing a shirt, and his left arm caught on fire. "He slung his arm" to put the fire out. Defendant then placed his arm

around Ms. Biggs, and they walked back home. She heard the airbag explode as they walked away. Ms. Biggs identified videos of the car catching on fire and Defendant swinging his arm to put the fire out. She also identified herself and Defendant walking away from the fire.

Ms. Biggs testified that she and Defendant arrived back at their apartment, and Defendant instructed to her go inside and get him a shirt. She and Defendant then left the apartment again and walked down the street past the Dollar General Store. Ms. Biggs could hear fire engines responding to the fire that Defendant had set. Defendant told Ms. Biggs to tell police that the victim took Ms. LeBron's car and that she and Defendant had been walking down the street talking about "owning a franchise and getting a house." Ms. Biggs identified a video of herself taking the bottle and bleach back into the apartment and retrieving Defendant's shirt. Ms. Biggs testified that she and Defendant eventually walked back to their apartment. Ms. Thomas came to the apartment and asked if they knew the victim's whereabouts. Defendant told her that the victim took Ms. LeBron's car and had given Defendant his wallet and keys "as collateral so that way he could use the car." Ms. Biggs got the victim's wallet and keys from the kitchen table and gave them to Ms. Thomas who was surprised that the victim would leave his wallet and keys with Defendant. Ms. Biggs did not know how Defendant came into possession of the wallet and keys. Ms. LeBron asked about her car the following morning but Ms. Biggs did not tell her that the car had been burned because Defendant told Ms. Biggs not to say anything. Ms. Biggs agreed that neither she nor Defendant had permission to burn Ms. LeBron's car.

Detective Adam Weeks of the Metropolitan Nashville Police Department testified that he was assigned as the lead investigator in the present case. He travelled to the CWA Apartments where the victim's body had been found. At the time, the victim had not been identified, although Ms. Thomas had reported him as missing. Detective Weeks looked at the dumpster and saw "two reddish-brown streaks about two to three inches [in] width and they were running sort of parallel and maybe about a foot or two apart from each other in sort of an arching pattern, starting from the middle of the drive up to the dumpster, the concrete pad that the dumpster sat on and then on the concrete pad was a significant apart [sic] of pooled apparent blood." Detective Weeks also saw circular drops of blood inside the dumpster, and "on the channel that the door would slide on there was pooling blood there as well." There was blood on the side of the dumpster and a secondary spot of pooled blood in the grass. Detective Weeks testified that the pools of blood and droplets of blood inside the dumpster were consistent with the victim's body being lifted up to the dumpster. He said:

> It, at some point whatever was bleeding was hanging over that sliding
> door and dripping vertically and then [the victim] was located at the
> bottom of that dumpster and there was basically a sort of an arching
> spear, or arching smear going from the opening of that dumpster down to

- 8 -

where the pooled blood was. From that I was at least working, my working theory was that someone tried to put him into that dumpster and then for whatever reason he slips and fell down and basically bl[ed] along the side of it as he was falling and then stayed, stayed where he was until we find him was at least the working theory at the time.

Detective Weeks testified that he and Detective Stanley drove to the Tony Sudekum Apartments to find Ms. Thomas. He located her on the balcony of Defendant's apartment and spoke to her and Defendant. At the time, Defendant was neither under arrest nor a suspect. Detective Weeks noted that he had not confirmed the victim's identity at that point. He testified that Ms. Thomas became very confident that the person found at the dumpster was the victim, and she became inconsolable and was unable to speak any further with Detective Weeks. He then spoke with Defendant who said that he, Ms. Biggs, and the victim had been drinking and doing some cocaine on the victim's balcony several hours earlier. Defendant claimed that they ran out of cocaine so the victim asked to use Ms. LeBron's car to go and buy more of the drug. Detective Weeks further testified:

According to [Defendant], [the victim] said, yeah, I know somebody that will sell me some but I have to go by myself he won't sell if somebody is with me that he doesn't recognize, so [Defendant] said that [the victim] left his wallet and ID with him, with [Defendant], sort of as collateral to borrow the car and then left to go presumably go get cocaine and, uh, just never returned. He said that they were sitting there together and he drove off and they hadn't seen him since and didn't know anything and by this point it had been, I spoke with him approximate[ly] 9 a.m. and he said that he had been missing since sometime around 1 a.m. or so, so for about eight hours by that point.

Detective Weeks' conversation with Defendant and Ms. Thomas was recorded.

Detective Weeks testified that he was able to verify through GPS records from Ms. LeBron's car and from video surveillance that the victim did not leave alone in the car to purchase cocaine. From the GPS tracker information, Ms. LeBron's burned car was located at the 100 block of Mildred Shute Avenue, which Detective Weeks testified was approximately four blocks from Charles E. Davis Boulevard. He noted that both the interior and exterior of the car had been burned, and it was apparent that a significant heat source had been used because the glass and steel of the car had also burned. The car was processed by the crime scene unit and then transported to impound lot. Detective Weeks spoke to one witness who heard loud noises outside and saw the car burning, but he did not see anyone in the area. Detective Weeks also received a surveillance video from a home in the immediate area where Ms. LeBron's car was found that showed the vehicle being set on fire. Detective Weeks testified that he used the car's GPS records to plot on

a map the areas where the vehicle had been. Detective Weeks also obtained surveillance videos from the Tony Sudekum Apartments, the Exxon Tiger Mart located at 227 Shelby Avenue, and the Samaritan House located across the street from the dumpster where the victim's body was found. On one of the videos from the Samaritan House, Detective Weeks identified a dark colored sedan pull in at approximately 1:24 a.m. on June 15, 2017, and park in front of the dumpster were the victim's body was found. The trunk of the car was facing the dumpster. The car drove away at 1:25 a.m. Detective Weeks asserted that shadows could be seen moving around the dumpster. Detective Weeks identified Tiffany Biggs on the video from the Tiger Mart. She arrived at the market at 1:27 a.m. on June 15, 2017, in a black Dodge Charger, and she left at 1:29 a.m. Detective Weeks testified that Ms. Biggs pumped gas that she paid for with coins totaling $2.71. Detective Weeks identified a black sedan on the video from the Samaritan House arriving back at the dumpster and stopping briefly before another car entered the apartment complex. There was also a point in the video that looked like an individual walking away from the area of the dumpster. Detective Weeks identified the black sedan leaving the apartment complex at approximately 1:33 a.m. He matched the GPS coordinates of Ms. LeBron's car to the vehicle seen on the surveillance videos.

Detective Weeks spoke with Ms. Biggs during the early morning hours of June 16, 2017. She was placed under arrest immediately after the interview. Detective Weeks testified that Ms. Biggs told him that she was with the victim and Defendant drinking beer earlier in the day on June 15, 2017, and that the victim and Defendant were also using cocaine. At the time, Detective Weeks did not believe her story to be true. He did not promise Ms. Biggs that she would not be charged with homicide if she told a particular version of her story, and he took a swab of her DNA.

Detective Weeks testified that Ms. Biggs later agreed to give a second statement after her attorney spoke with someone from the district attorney general's office. At the time, neither Detective Weeks nor anyone from the police department offered Ms. Biggs anything in exchange for her statement. He met with Ms. Biggs and her attorney, and Ms. Biggs gave him information that matched evidence that Detective Weeks had already gathered. She was also able to fill in some missing portions of the evidence. Detective Weeks created maps of the "movements and activities" supplied by Ms. Biggs and corroborated by other evidence.

*Analysis*

Defendant contends that the evidence was insufficient to support his convictions for first degree murder, tampering with evidence, and setting fire to personal property or land. More specifically, he argues that the evidence did not prove his identity as the perpetrator of the crimes and that the State failed to prove that he lacked consent to set fire to Ms. LeBron's car.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009) (citing *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (citing *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005); *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *Hanson*, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." *Wagner*, 382 S.W.3d at 297 (citing *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)).

When the only proof of a crime is the uncorroborated testimony of one or more accomplices, then the evidence is insufficient to sustain a conviction as a matter of law. *State v. Collier*, 411 S.W.3d 886, 894 (Tenn. 2013) (citing *State v. Little*, 402 S.W.3d 202, 211-12 (Tenn. 2013)). Additionally, accomplices cannot corroborate each other. *State v. Boxley*, 76 S.W.3d 381, 386 (Tenn. Crim. App. 2001). This court has defined the term "accomplice" to mean "one who knowingly, voluntarily, and with common intent with the principal unites in the commission of a crime." *State v. Allen*, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997). This means that the person must do more than have a guilty knowledge, be morally delinquent, or participate in other offenses with the principal actor. *State v. Jackson*, 52 S.W.3d 661, 666 (Tenn. Crim. App. 2001). The test for whether a witness qualifies as an accomplice is "whether the alleged accomplice

could be indicted for the same offense charged against the defendant." *Allen*, 976 S.W.2d at 666.

Although a defendant cannot be convicted solely upon the uncorroborated testimony of an accomplice, our supreme court has noted that the corroboration required can be slight. The court stated that in order to properly corroborate accomplice testimony:

> [t]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. The corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's [testimony].

*State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001) (quoting *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994)). The sufficiency of the corroboration is a determination entrusted to the jury as the trier of fact. *Shaw*, 37 S.W.3d at 903.

Defendant was convicted of first degree murder, tampering with evidence, and setting fire to personal property or land. First degree murder is "a premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1). Tampering with evidence occurs when a person knows an investigation is pending or is in progress and the person proceeds to "[a]lter, destroy, or conceal any record, document or thing with intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding." T.C.A. § 39-16-503(a)(1). In order to convict Defendant of setting fire to personal property, the State was required to prove that Defendant knowingly damaged personal property by means of fire or explosion and that he did so "[w]ithout the consent of all persons who ha[d] a possessory or propriety interest therein[.]" T.C.A. § 39-14-303(a)(1). Defendant does not challenge whether the evidence established that the murder was premeditated. Rather, he asserts the evidence is insufficient to prove his identity as the murderer. He also contends that the evidence was insufficient to establish that he committed any of the other crimes. "The identity of the perpetrator is an essential element of any crime." *State v Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving beyond a reasonable doubt the identity of the defendant as a perpetrator. *State v. Cribbs*, 967 S.W.2d 773, 779 (Tenn. 1998). Identity may be established by either direct evidence or circumstantial evidence, or a combination of the two. *Thompson*, 519 S.W.2d at

793; *see also State v. Lewter*, 313 S.W.3d 745, 748 (Tenn. 2010). The identification of the defendant as a perpetrator is a question of fact for the jury after considering all the relevant proof. *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005) (citing *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993)).

Defendant argues that although the State presented surveillance video placing him near the scene of the crimes, there was no direct evidence establishing that he murdered the victim and that the primary evidence implicating him was from his co-defendant Tiffany Biggs. He also asserts that Ms. Biggs did not actually see him "commit either [sic] crime in this case."

In a light most favorable to the State, the proof presented at trial was sufficient to establish the identity of Defendant as the perpetrator of all of the crimes and to corroborate Ms. Biggs' testimony. On the night of the murder, Defendant, Ms. Biggs, and the victim got into Ms. LeBron's black Dodge Charger together and drove to a parking lot at the corner of Charles E. Davis Boulevard and Fain Street. Defendant instructed Ms. Biggs to keep the car running but turn the lights off. Defendant and the victim got out of the car and then later returned. Ms. Biggs testified that she heard the two men talking, and then there was a thud on the car, and the car shook. She said that Defendant was acting aggressively and breathing heavily, and he instructed her to open the trunk. Ms. Biggs could see Defendant doing something in the trunk, but she could not see what was inside. Defendant then got back into the car without the victim. Ms. Biggs identified a surveillance video depicting the actions of her and Defendant in the parking lot.

Defendant and Ms. Biggs then drove to the CWA Apartments on South Fourth Street and parked in front of a dumpster. Ms. Biggs saw Defendant take the victim out of the trunk, and she heard a snoring sound. Defendant dragged the victim across the pavement and into the grass beside of the dumpster. Defendant instructed Ms. Biggs to leave and purchase some gasoline. Ms. Biggs drove to the Exxon gas station on Shelby Avenue and purchased gasoline which she pumped into the car and into an empty water bottle. She identified herself on the surveillance video from the Exxon station. Ms. Biggs drove back to the CWA Apartments and parked in front of the dumpster. She testified that the victim's body was still there, and the shirt that Defendant had previously been wearing was missing. Ms. Biggs picked Defendant up, and they drove back to their apartment. As instructed by Defendant, Ms. Biggs went inside the apartment and retrieved a rag and spray bottle with bleach, and she got back into the car. She drove to a grassy area and parked the car. Defendant wiped the car down with the rag and bleach and then told Ms. Biggs to get out of the car and not to move or touch anything. Defendant poured gasoline in the trunk of the car and in the back seat, and he set the car on fire. Defendant was still not wearing a shirt at that point, and his left arm caught on fire. Ms. Biggs testified that he "slung his arm" to put the fire out. Ms. Biggs identified surveillance videos of the car catching on fire and Defendant swinging his arm to put the

- 13 -

fire out. She also identified herself and Defendant on the video walking away from the fire. The victim's body was found by the dumpster with his throat cut, and he later died as a result of sharp and blunt force injuries to his neck and head.

Quentesa House, who lived in the CWA Apartments, testified that during the early morning hours of June 15, 2017, she saw two men standing over the body of another man. The body was behind a dumpster. One of the men pointed what looked like a gun or knife at her. Ms. House testified that both of the men were black, and one was "heavy set" and had dread locks. She said that one of the men ran away from the scene on foot, and the larger man got into a four-door black car with a white woman and left the scene.

Ms. Biggs' testimony was corroborated by surveillance video from numerous locations, including the area of the dumpster where the victim's body was found. It was also corroborated by the GPS tracker information that Detective Weeks used to create maps of Defendant's and Ms. Biggs' "movements and activities" at the time of the murder. Detective Weeks noted in his testimony that Ms. Biggs gave him information that matched information that he had already gathered, and she was able to fill in some missing portions of the evidence. Detective Harris testified that when he participated in executing a search warrant at Defendant's house, he noticed that the hair on Defendant's right forearm was "substantially shorter and missing than the hair on his left forearm." Although Ms. Biggs did not testify that she actually saw Defendant murder the victim, a jury could infer from the evidence that Defendant was the person who committed the murder and set Ms. LeBron's car on fire. At the time that Defendant set Ms. Lebron's car on fire, a jury could infer that Defendant knew that an investigation would be pending and that he wiped the car down with bleach and then burned the car down to its metal frame in order to destroy the ability of law enforcement to find any evidence in the car or to obtain fingerprints or DNA on the vehicle or find any blood in the trunk. Defendant also asserts that Ms. Biggs' testimony was not credible. However, the jury, as trier of fact, must evaluate the credibility of witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996).

In addition to arguing that the evidence was insufficient to establish his identity as the person who committed the offenses, Defendant further asserts that the State did not prove that he lacked consent to burn the vehicle because Ms. LeBron did not testify at trial. At trial, the parties stipulated that Ms. LeBron purchased the Dodge Charger and that she was the sole owner of the vehicle. Ms. Biggs testified that Ms. LeBron asked about the car the following morning after it had been burned by Defendant. Ms. Biggs did not tell her about the car because Defendant had told her not to say anything. Ms. Biggs agreed that neither she nor Defendant had permission to burn Ms. LeBron's car. Therefore, the evidence was sufficient to show that Ms. LeBron did not consent to the burning of her car.

- 14 -

The proof admitted at trial was clearly legally sufficient to sustain Defendant's convictions of first degree murder, tampering with evidence, and setting fire to personal property or land.

CONCLUSION

After a thorough review of the record and applicable law, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, JUDGE